Appellants filed their bill in the circuit court for partition and other relief. The property involved is certain lots in the village of Naperville, DuPage county, and a license granted by the village of Naperville for the construction and operation of a switch from the main track of appellee, the Chicago, Burlington and Quincy Railroad Company, to certain stone quarries of those who secured the license to build the track. For a better understanding of the case at the outset, we may here say the track was built, the quarry owners paying all the expense of it except for the rails, splices, fish-plates and bolts, in accordance with the contract hereafter mentioned. The bill alleged appellee has wrongfully appropriated the license and right of way granted to the quarry owners by the village, and also the right of way *Page 336 
over the property of appellants, without condemnation or paying compensation therefor. Appellants filed a waiver of the right to require the institution of condemnation proceedings, and an election to accept compensation for the property so appropriated by appellee, damages to remaining lands and for past use and occupation. Part of the relief prayed for was that appellee account to appellants for the number of cars of others than quarry owners moved over the switch-track, and for an injunction.
The answer neither admitted nor denied appellants' title to the lots described in the bill, but denied appellants, or any of them, owned the license granted by the ordinance of the village of Naperville. The answer admits appellee has for many years moved cars over the switch-track in the discharge of obligations imposed upon it by law; avers the village of Naperville had no authority to grant private individuals the right to lay a railroad track in its streets, and that when the track was constructed and connected with appellee's lines it became its legal duty to furnish cars to and from industries along said track; admits entering into the agreement set out in the bill, and sets out a list of industries, other than appellants' quarries, located along the line of the switch-track, and avers that it does not appear from the bill that the owners of those industries have not acquired the right from appellants' predecessors in title to have cars shipped over the switch; denies appellee ever entered into a verbal contract with the quarry owners to pay them for every car switched over the track for other shippers; denies it ever paid the quarry owners one dollar per car, or any other sum, for cars shipped over the switch-track, and avers that any contract to do so would be unlawful and void. The answer sets up and relies upon the Statute of Frauds and the ten and five years Statutes of Limitations.
The decree finds appellants own the lots described in the bill over which the switch-track is constructed, subject to the easement of appellee, to continue so long as it operates *Page 337 
the track, and that the track was laid under the authority of the Naperville ordinance, partly upon streets and partly on private property; that it was constructed under a contract entered into by the then quarry owners and appellee, each paying a portion of the cost, the quarry owners to pay an annual rental upon that part of the cost paid by appellee and also to pay for the maintenance of the track. The claims of appellants for compensation for the easement and license under the ordinance and for an accounting were denied for want of equity. Partition of the lots was decreed, subject to the easement of appellee to operate the switch-track.
That appellants own the title to the lots is not in dispute, but that they own the license granted by Naperville by ordinance to lay the track is denied, and the decree finds the claim was without equity. The switch-track was built-under the contract entered into July 1, 1889, between appellee, as party of the first part, and J. Salfisberg, Boecker von Oven and the Chicago and Naperville Stone Company, as parties of the second part, owners of the quarries, and is as follows:
"This agreement, made this first day of July, A.D. 1889, between the Chicago, Burlington and Quincy Railroad Company, party of the first part, and J. Salfisberg, Boecker von Oven, and the Chicago and Naperville Stone Company, parties of the second part:
"Witnesseth: That whereas, for the accommodation of parties of the second part and for the promotion of their interests, party of the first part has constructed and laid a certain side-track at Naperville, DuPage county, Illinois, upon land owned or furnished by parties of the second part, said side-track being described as follows: Beginning at the heel of frog on the south side of the south main track of party of the first part three hundred fifty-one and eight-tenths (351.8/10) feet easterly from mile-post No. 29, measured on the center line of said south main track; thence *Page 338 
westerly and southerly to the intersection of Douglas avenue and Ewing street; thence south in Ewing street to Jefferson avenue; thence southerly and easterly through block 2, original town of Naperville, to the intersection of Jackson avenue and Mill street; thence east in Jackson avenue to a point between Webster and Main streets. The total length of said side-track from heel of frog to end of track being four thousand three hundred seventy-five and four-tenths (4375.4/10) feet; and whereas parties of the second part did make the grade and place the road-bed in proper condition to receive said side-track and did also furnish the ties, spikes and timbers necessary in the construction of the same, and did pay for the labor expended in the construction thereof; and whereas party of the first part did furnish the rails, splices, fish-plates, bolts, etc., used in the construction of said side-track at a cost to party of the first part of one thousand eight hundred five and 83/100 dollars ($1805.83):
"Now, therefore, in consideration of the premises and of the undertakings and promises herein set forth, it is agreed as follows:
"I. Parties of the second part hereby agree to pay to party of the first part for the use of said side-track the sum of one hundred forty-four and 47/100 dollars ($144.47) per annum, said sum being eight (8) per cent interest per annum on the cost of material furnished by party of the first part in the construction of said track. Said rental to be paid quarterly in advance.
"II. Parties of the second part hereby agree to keep said road-bed and track in such repair as shall be required by the superintendent of party of the first part. If parties of the second part shall not within fifteen (15) days after notice from party of the first part that certain repairs are needed make the same, then party of the first part may, at its option, make such repairs at the expense of parties of the second part or declare this contract terminated, and all rights *Page 339 
of parties of the second part hereunder shall thereupon be forfeited. In case such repairs are made by party of the first part the expense thereof shall be refunded and paid by the parties of the second part to party of the first part on demand; and parties of the second part hereby agree to reimburse and indemnify party of the first part for all damages sustained by it or for which it may be liable by reason of the imperfect condition of said side-track.
"III. It is further agreed by parties of the second part that party of the first part shall have the privilege of using said side-track free of charge: Provided, however, that such use shall not materially interfere with the business of parties of the second part.
"IV. In case it is desired by other persons engaged in business in the vicinity of said side-track to connect therewith or extend the same by building additional tracks from said side-track to their own warehouses, manufactories or premises, then such other persons shall have the right to make such connection and to use the said side-track upon paying therefor such sum to parties of the second part as rental as may be deemed reasonable by the superintendent of party of the first part.
"V. Parties of the second part hereby agree that they will execute no mortgage or other lien upon the portion of land upon which said side-track is laid which will become a lien upon the rails, splices, fish-plates, bolts, etc., furnished and owned by party of the first part in said side-track. Parties of the second part further agree that party of the first part shall have the right, upon the termination of this contract by expiration of time or by notice, to enter upon said premises and remove therefrom all property belonging to party of the first part.
"VI. It is further understood and agreed that for any default on the part of parties of the second part in any of their agreements expressed in this contract or for failure to perform any of their undertakings as set forth, party *Page 340 
of the first part may terminate this contract by giving parties of the second part thirty (30) days' notice of such termination.
"VII. It is further understood and agreed that parties of the second part shall not transfer or assign this contract nor grant any interest herein or in said side-track to any person or corporation without first obtaining the written consent of party of the first part.
"This contract shall continue for the term of five (5) years from said first day of July, A.D. 1889, subject to cancellation as aforesaid.
"In witness whereof the party of the first part by its proper officer, and the parties of the second part, have hereunto set their hands and seals the day and year first above written.
"Executed in duplicate."
No other contract was entered into upon its expiration, but the parties continued to operate as they had under the contract of July, 1889. Appellants are successors in title to the titles of the quarry owners who were parties to the contract. Before the track was built, Naperville by ordinance granted a license to William King, trustee, his successors and assigns, to lay, maintain and operate a single track railroad, with necessary sidings and turn-outs, in and upon certain streets named, and any other land the trustee, his successors or assigns, might acquire, subject to all ordinances of the village. The ordinance imposed a condition that the trustee, his successors or assigns, should permit any person or corporation authorized by ordinance to build intersecting tracks within the village to carry property to the railroad from other industries situated within a thousand feet of the railroad upon making reasonable compensation therefor. By an ordinance adopted April 15, 1889, the trustee was authorized to convey to Salfisberg, Thomas P. Phillips, Bernard B. Boecker and Ernest von Oven all rights of way, power and privileges granted by the original *Page 341 
ordinance. Pursuant to the ordinance the conveyance was made June 26, 1889.
As we understand, Phillips represented the Chicago and Naperville Stone Company, and appellants have succeeded to whatever rights were acquired by the quarry owners by virtue of the ordinances and the contract of July 1, 1889.
There is no question that appellee claims the right of an casement over appellants' lots and the license to operate the switch-track in the streets of Naperville. It denies liability to pay compensation for either, and insists upon its right to operate the track independent of any right or claim of appellants, which it is now doing. The operation of the quarries was discontinued in 1905. In 1906 the spurs leading into the quarries were taken up by appellee, and the main switch-track has now no connection with the quarries.
Appellants claim the right to compensation for the right of way over their lots, for the right of way license to operate the switch-track over its entire length, and damage to land not taken.
From 1890 to 1901 appellee paid the quarry owners, presumably as owners of the switch-track, one dollar per car for cars shipped over the switch by other shippers than the three quarry owners. No charge was made against the quarry owners for cars shipped by them over the track. Neither appellants nor their predecessors in title have conveyed or released to appellee any interest or right they have in the switch-track right of way or any private property over which the track runs.
Appellee's position is, that the switch-track, when built, became under the law a part of its railroad, and that the effect of the ordinance of Naperville was to grant to the quarry owners the right, if they desired to exercise it, to lay a track in the streets and over such other ground as they might have or acquire the right to lay the track over, to connect their quarries with appellee's railroad; that the village had no authority to grant the quarry owners the *Page 342 
right to lay a railroad track on its streets unless the track connected with appellee's railroad; that the grant by the village of the right to use the streets for the track was on condition that the quarry owners should secure the right of way over other property necessary to connect the switch with appellee's road, and the right of way over private property is an easement granted by the quarry owners by the acceptance of the ordinances and constructing the switch, which easement is perpetual and not limited to the time the quarries are operated. Appellee insists appellants may open up their quarries any day they desire, and use the switch.
It is insisted by appellee that the right to lay the switch did not arise out of the contract of July 1, 1889. The contract merely settled who should pay for it, but the right to lay the track depended upon the ordinances, and by giving their consent to lay the track over their private property the quarry owners gave an easement over their lands which they cannot revoke and are not entitled to compensation for.
It seems necessary to determine the status of the switch-track after it was constructed. It is undisputed that the right of way was procured by the quarry owners, and they paid all the cost of material and labor in constructing the track except that the rails, splices, fish-plates and bolts were furnished by appellee. The quarry owners agreed to pay appellee an annual sum named, as an interest charge on the cost of material furnished by appellee, and pay the expense of keeping the track in such repair as should be required by appellee's superintendent.
Appellee, as we have said, contends that the switch-track, as soon as its construction was completed, became a part of its railroad, and the only interest the quarry owners or their successors in title had in it was to use it in shipments from the quarries. This court has held that switch-tracks built for industrial connections with railroads, whether built at the expense of the railroad or the owners *Page 343 
of the industry, or at the joint expense of both, become, in legal contemplation, tracks of the railroad with which they are connected, open to public use and subject to public regulations. (Chicago Dock Co. v. Garrity, 115 Ill. 155; PublicUtilities Com. v. Smith, 298 id. 151. Do those decisions require the court to hold that after the completion of the switch-track over a right of way procured by the quarry owners they and their successors in title had no other interest in it except to pay the annual interest charge, the expense of maintaining it in repair and the use of the track in shipping from their quarries? It is true, as appellee asserts, the authority to construct the switch was given by the ordinance, and the cost of construction and maintenance was provided for by the contract of July 1, 1889; but it certainly shocks the natural sense of justice to say that when the track was completed it became the property of appellee, divested of any other interest of the quarry owners than the right to ship over it and the obligation to pay an annual interest charge and pay the expense of maintaining it in repair. It appears the annual interest charge was reduced, and on the basis of certain evidence offered, the competency of which is disputed, in 1901 the quarry owners were in arrears in the payment of the bills incurred by appellee in repairing the switch. With that exception, as we understand it, it is not claimed there was any failure of the quarry owners to comply with the contract. The quarry owners could not lawfully build and operate a railroad, nor could they build a switch-track for their quarries to the railroad and restrict its use to their own private use. Any switch-track so built the law requires shall be open to the public use and be operated by the railroad with which it connects. The requirement of law that the track should be open to the use of the public was recognized by the ordinance making provision for connecting other industries with the switch and its use by such other industries upon payment of reasonable compensation, *Page 344 
which is a requirement now provided for by section 45 of the Public Utilities act.
We are of opinion that the rational meaning and effect of the decisions are, that a railroad company and the private owner of an industry cannot, by any agreement or arrangement between themselves, build a switch-track and limit its use to certain shippers, but when it is constructed it is open to public use and regulation without regard to who paid the cost of construction. The law requires the railroad company with which it connects to so operate it, and for that purpose regards it as the track of the railroad company, but we do not believe a private arrangement or agreement between the owner of an industry who builds a connecting switch, and the railroad company, which in no way affects its use by the public, is prohibited by law or contrary to public policy. For years appellee recognized the quarry owners had an interest in the track other than the right to ship the product of their quarries over it. They were charged nothing by the railroad company for its use, and they were paid a dollar for each car shipped over the switch by other industries which were connected with the track. That was one-half the charge collected by appellee from such other industries served by the switch. Why should it have done these things if the quarry owners were not considered by it as owning some interest in the track other than the general public? We are warranted in inferring that the quarry owners were paying the expense to appellee of maintaining the track in repair all these years. It would seem there was reason for regarding those who substantially built the switch and paid appellee the cost of keeping it in repair had some interest in the track as owners. So long as the recognition of such right of ownership did not affect the public interest or public use of the track, there is no occasion for the law to interpose and approve the appropriation of the track and right of way by appellee. The law is designed to protect private rights as well as *Page 345 
public rights, and we are unable to see wherein the public interest will be promoted by holding appellee became the owner of the track and right of way when it was completed, and that when the quarries ceased to operate it was under no obligation to pay appellants any compensation either for the license granted them by Naperville or for the easement in their lands over which the track is laid.
About the time the track connecting the quarries with the switch were removed, as we understand, appellee began insisting that the quarry owners recognize and use the switch on the basis of its being appellee's property. The record shows there were a number of interviews between representatives of the quarry owners and of appellee. Appellee was preparing to take up the track connecting with the quarries, and representatives of the quarries were opposing that action and also claimed ownership of the switch. In July, 1905, the division superintendent of appellee wrote the quarry owners that after December 31, 1905, certain tracks leading to the quarries would be taken up. The quarry owners protested and said they intended resuming operations. They claimed to own the track, and proposed that some kind of an arrangement be made by which the quarries could be operated. We do not understand the proof to show the owners intended permanently to abandon their quarries. They cannot successfully operate them now, since their track connections have been removed, as it is apparent switch connections are indispensable to the practical and successful operation of a stone quarry.
Much weight is attached by appellee to certain evidence, admitted over appellants' objection, supposed to have an important bearing upon the case. An entry in appellee's book, made in 1901, contained the notation, "Cancelled. C. B. Q. maintain track. See letter from J.D. Besler, 5-10-01." H.D. Clark, chief clerk of the division superintendent of appellee, testified the entry was in his handwriting and was made in regular course of business. The *Page 346 
letter referred to in the notation was admitted in evidence over appellants' objection, and was as follows:
"CHICAGO, May 11, 1901.
"Mr. H.D. Judson, Supt. Chicago Division, Aurora:
"DEAR SIR — Referring to the Naperville stone quarry track. As a matter of record I would say that arrangement was made to-day with Mr. T.P. Phillips (at which time you were present) providing that the bills now due from Mr. Phillips, also bills made for cost of putting the track in proper shape, will be added together, and he agreed to stand one-half of the amount and the railroad company will assume the balance. The C., B. 
Q. is to retain the amounts received from other parties for private switching over this track and the railroad company to keep the track in repair hereafter. The arrangement is to take effect from this date.
"Yours truly,
J.D. BESLER."
Besler was general superintendent and Judson division superintendent of appellee. Phillips is the name of one of the quarry owners who constructed the track under the license granted by the Naperville ordinance. It was not shown he had any interest in the switch or quarries at the date the letter was written. That proof, appellee claims, shows that by an arrangement made with Phillips on May 11, 1901, he (presumably the quarry owners) agreed the bills then due from him and the cost of putting the track in proper shape would be added together and he would pay one-half, appellee to assume the balance. Appellee was to retain the amounts received from other parties for switching over the track and thereafter keep the track in repair. Appellee's books show some charges were made against one, at least, of the quarry owners in 1902, but we have discovered no proof that the charges were paid. The evidence was not competent. It was not shown Phillips was at the time a quarry owner, or that, if he was, he had authority to represent the others in making any agreement with appellee. As we understand the proof, the Dolese Shepard Company and the Naperville Stone Company were then the owners. The proof does not show that they knew anything *Page 347 
about the matter. The entry in appellee's books requires explanation, was made by a clerk of appellee presumably after he had seen the letter from Besler to Judson, and, so far as the record shows, neither appellants nor their predecessors in title had any knowledge of the letter. To bind them it must appear that they knew of and assented to the agreement, which was not reduced to writing. Even if the evidence was competent, it would not prove that there was a compromise of what appellee claimed was due it under the original contract, in consideration of which and the release of one-half the switching charges paid by other shippers the quarry owners were released from the obligation to keep the track in repair. Nothing was said about any property right in the track or whose property it was. We think the conclusion warranted from appellee's acts that about the time the letter was written, or soon afterwards, it claimed the track was its property and ceased paying the quarry owners a share of the charges collected from other shippers and ceased collecting the cost of keeping the track in repair. However that may be, appellee's claim of ownership was never assented to by the quarry owners.
We are of opinion appellants are owners of the right of way and an interest in the track in the proportions that the amount they paid for its construction bears to the amount paid by appellee, that they are the owners of the fee in certain lots in the village of Naperville over which the track runs, and that appellee has appropriated their property and should compensate them for it and for any damage to property not taken. Appellants having filed July 31, 1923, an election to treat the acts of appellee as an appropriation and to accept compensation, the appropriation should be considered as made the date the waiver and election were filed. We do not think we would be warranted in ordering an accounting for cars of others than appellants shipped over the switch-track. *Page 348 
Under the view we have taken of the case it is unnecessary to consider the Statute of Frauds or of limitations.
The decree is reversed and the cause remanded to the circuit court of DuPage county for further proceedings and a decree in harmony with the views herein expressed.
Reversed and remanded.
Mr. JUSTICE HEARD, dissenting.